THE STATE v. MARTIN PAULSGROVE, Appellant.

Division Two, April 2, 1907.

1. **TRANSCRIPT: Criminal Cases.** Counsel in a criminal case should superintend the making up of the transcript, and see to. it that it is properly certified and otherwise complies with the law and the rules of the court.

2. **INSANITY: Instruction: Excuse: Omission of Word "Always."** The instruction should tell the jury that "partial insanity does not always excuse," and the word "always" should not be omitted. But where, upon a reading of the whole instruction from which that word is omitted, it seems impossible that the jury could have been misled by that inadvertent omission, it will not be held to be reversible error.

3. ——: **Excuse for Crime.** One may be partially insane and yet responsible for his criminal acts. The law does not excuse unless the derangement is so great that it actually renders the accused incapable at the time of committing the offense of distinguishing between the right and the wrong in reference to the particular act charged and proven against him.

203 Sup—13

4. ———: Instruction: Proof: Like any Other Fact: Insertion of Word "Not." In one instruction given for the State the jury were told that "insanity is a fact which may not be proven like any other fact." *Held*, that the word "not" was incorrectly incorporated, but that was so plainly an inadvertence that, when all the instructions given are considered together, it cannot be seen that it had any prejudicial effect upon the rights of defendant.

5. ———: Question for Jury. Where the instructions given on both sides fairly and fully submit to the jury the issue as to the sanity or insanity of the defendant and his criminal responsibility in the killing of his sweetheart, and there is evidence that tends to support the defense that he was not responsible for the homicide and ample evidence to the contrary, and no error was committed in the admission and exclusion of evidence, the issue is one for the jury to determine; and if their finding is free from bias and prejudice, the court will not interfere therewith.

6. ———: Instruction for Murder in Second Degree. Where there is no evidence of just provocation and defendant is clearly guilty of murder in the first degree or excusable on the ground of insanity, the court should not direct the jury that if defendant in an excited and passionate frame of mind, without adequate cause or provocation, killed the deceased, they will find him guilty of murder in the second degree. No instruction on murder in the second degree should be given in such case.

7. ———: Instruction on Manslaughter. An instruction that seeks to have the court instruct on manslaughter in the fourth degree if the defendant killed deceased because she refused to marry him, should be refused. Unless there is some evidence tending to show a lawful provocation for the homicide, no instruction for manslaughter in the fourth degree should be given.

8. ———: Instruction on Circumstantial Evidence. Where the defense is insanity and all the evidence as to defendant's mental condition was open, direct and oral, and there was no circumstantial evidence about who committed the homicide, an instruction which seeks to submit to the jury the law as to a conviction upon circumstantial evidence would be misleading and should be refused.

9. REFUSING CORRECT INSTRUCTIONS. Where the instructions given fully and fairly cover every issue in the case, a refusal of correct instructions asked by defendant, is not error.

Appeal from DeKalb Circuit Court. — *Hon. A. D. Burnes,* Judge.

AFFIRMED.

*Herbert S. Hadley,* Attorney-General, and *John Kennish,* Assistant Attorney-General, for the State.

(1) Only the record proper is before this court for review. (a) No authenticated bill of exceptions appears as part of the record in this case. What purports to be a bill of exceptions does not contain the instructions, the motion for a new trial or motion in arrest of judgment, and is not signed by the judge nor certified to by the clerk of the court. State v. Baty, 166 Mo. 561; Reno v. Fitz Jarrell, 163 Mo. 411. Copying the motions for a new trial and in arrest in the record proper does not preserve them in the bill of exceptions. State v. Revely, 145 Mo. 666; State v. Griffin, 98 Mo. 672. (b) It is shown by the record that the motions for a new trial and in arrest of judgment were filed after judgment and sentence, nor was any objection made when judgment was rendered nor motion by defendant to set the same aside in order that motions for a new trial and in arrest of judgment might be filed. The motions for a new trial and in arrest must be filed before judgment. R. S. 1899, secs. 2689, 2690; State v. Rosenblatt, 185 Mo. 114; Willis v. State, 62 Ind. 391. (2) The court did not err in giving instructions to the jury on behalf of the State. Fifteen instructions were given on behalf of the State covering the subjects of murder in the first degree, the presumption of innocence, reasonable doubt, absence of motive and credibility of witnesses, and as to the effect of statements made by defendant concerning the offense charged. These instructions were in accordance with approved precedents. Instructions were also given fully covering the law of insanity, and were in

conformity with the precedents of this court on that subject. State v. Pagels, 92 Mo. 314; State v. Duestrow, 137 Mo. 44; State v. Speyer, 182 Mo. 66; State v. Church, 199 Mo. 605. In instruction 6, given on behalf of the State, the word "not" seems to have been omitted by mistake, but as the same subject was fully and correctly covered by instruction 10, given on behalf of defendant, the jury could not have been misled by such mistake. (3) Ten instructions were given on behalf of defendant, and presented the law of the case in at least as favorable form as the defendant was entitled to. Of the seventeen instructions asked by defendant, seven were properly refused by the court. The first because under the law the defendant was not entitled to an instruction on the theory of murder in the second degree. State v. Speyer, 182 Mo. 77; State v. Holloway, 156 Mo. 222; Baldwin v. State, 12 Mo. 223. The second, because the court had fully instructed on that question in instruction 3 given on behalf of defendant. The third, because the question sought to be presented therein was fully covered by instruction 3 given on behalf of the State, and 5 given on behalf of the defendant. The fourth, because there was no evidence in the case to authorize an instruction on manslaughter in the fourth degree. Baldwin v. State, supra. The fifth and sixth, because the court had fully instructed on the questions of law presented therein. The seventh, because defendant is not entitled to an instruction on circumstantial evidence in a case where the defense is insanity. State v. Soper, 148 Mo. 239.

GANTT, J.—From a conviction and sentence for murder in the first degree by the circuit court of DeKalb county, the defendant has appealed to this court.

This prosecution was commenced on the 20th of January, 1905, by the filing of an information by the prosecuting attorney of Andrew county in the office

of the clerk of the circuit court of said county in vacation, charging the defendant with murder in the first degree of Mary Newman. At the May term, 1905, the cause was set down specially for trial on the 29th of August, 1905. On the last-mentioned date, the defendant was duly arraigned and a plea of not guilty entered. On a proper application, a change of venue was granted to DeKalb county. At the October term, 1905, of the DeKalb court, the defendant was tried and convicted of murder in the first degree. Motions for new trial and in arrest of judgment were filed and overruled and the defendant duly sentenced by the court. The defendant is not represented in this court by counsel and this has necessitated an examination of the whole record by this court.

The testimony discloses that at the time of the homicide, the 18th of January, 1905, the defendant was an unmarried man about twenty-four years of age, and resided in Andrew county. He had served as a soldier in the Army of the United States in the Philippine Islands for probably two years, and after the return of his regiment to the United States, he was discharged and returned to Andrew county in the early part of 1904. The father of the defendant resided on a farm in Andrew county seven miles east of Savannah. The defendant worked as a farm hand in the neighborhood, and stayed at the home of his father part of the time. The deceased, Miss Mary Newman, lived with her parents some three or four miles distant from the Paulsgrove home. At the time of the homicide she was teaching school in the Paulsgrove neighborhood and boarding with that family. The defendant had been a suitor of Miss Newman for nearly a year after his return from the army to Andrew county, and had frequently called upon her at her own home and at his father's. He visited her at the latter place the night before the homicide. On Wednesday evening

about three o'clock, January 18, 1905, the defendant came to his father's house and remained there conversing with the members of the family until about 4:30 p. m., when Miss Newman and three of the smaller Paulsgrove children returned from school. In a few minutes after her arrival, the defendant told Miss Newman that he wanted to see her, and they went into the parlor, which seems to have been the east room on the ground floor of the building, and closed the door. After they had been in the parlor a short time, the family heard Miss Newman scream "O, Martin, don't!" Mrs. Paulsgrove ran to the parlor door, opened it, and saw the defendant have hold of Miss Newman; Mrs. Paulsgrove seized him and he then turned upon her, she jumped behind the stove, and he shot at her twice with a pistol; he then forcibly took Miss Newman from the parlor into the adjoining sitting room, the latter struggling and resisting until she fainted. He then pulled her upon the bed in the sitting room, and shot her twice through the head, each of which wounds was mortal.

The defendant, prior to the homicide, had tried to buy a revolver at different places, saying he wanted to shoot rabbits. About two hours before the homicide, he bought a revolver at a little village called Kodiac about two miles from the Paulsgrove residence.

For some time before the homicide the defendant had told a number of people in the neighborhood of his affection for Miss Newman, and to several had stated that he intended to be married to her. On one occasion, when he was told not to be too sure of it, that she might go back on him, he replied with an oath that if she did, he would shoot her.

Just after the shooting of the deceased by the defendant, he went out of the house on the north side and said, "I loved her and she threw me away, I could not stand it, and I killed her." He remained

at his father's house about half an hour after the shoot-
ing. During that time he cut the telephone wire and
said to his half brother, "Do not speak a word, you ·
have done me enough dirt, but I will let you go this
time." He then left his home and went to Savannah,
where he was arrested about ten o'clock that night.

The defense was insanity. The depositions of five
soldiers, a lieutenant of the company in which he
served in the Philippine Islands, and four other mem-
bers of the company, were read in evidence and tended
strongly to prove that the defendant was insane dur-
ing the time of his service in the Philippines. There
were other witnesses also, who had known the defend-
ant in the neighborhood in which he lived and had
been reared, whose testimony tended to prove that the
defendant was not of sound mind. On the other hand, ·
the State introduced a large number of witnesses, in-
cluding the neighbors and farmers for whom the de-
fendant had worked, and other testimony covering the
defendant's life from his boyhood until the date of the
homicide, which tended to prove that he was not in-
sane; that while he was not of a very bright mind, he
was reasonably intelligent and of sound mind, and
that he was an exceedingly trustworthy and industri-
ous boy and man in the performance of his work as a
farm laborer and an employee of the dairy company.

The information is in all respects sufficient and
according to the often approved precedents, and it is
therefore unnecessary to set it forth at length. It
was duly verified by the prosecuting attorney.

The court submitted the case to the jury upon
an issue of murder in the first degree, and upon a
plea of not guilty and a plea of insanity. The court
defined the words "wilfully," "feloniously," "deliber-
ately," "premeditatedly," "malice" and "malice
aforethought" as those words have often been defined
in instructions which have met the approval of this

court. And also gave the usual instructions on the presumption of innocence, reasonable doubt, the credibility of the witnesses and good character, and then the court instructed the jury as follows:

."Insanity is a physical disease located in the brain, which disease so perverts and deranges one or more of the mental and moral faculties as to render the person suffering from this affliction incapable of distinguishing right from wrong, in reference to the particular act charged against him, and incapable of understanding that the particular act in question was a violation of the laws of God and society. Wherefore, the court instructs the jury that if they believe and find from the evidence that the defendant, at the time he did the killing alleged in the information, was so perverted and deranged in one or more of his mental and moral faculties as to be incapable of understanding at the time he killed Mary Newman that such killing was wrong, and that he, the defendant, at the time was incapable of understanding that this act of killing was a violation of the laws of God and society, they should find him not guilty. Insanity is either partial or general. Total insanity always excuses. Partial insanity does not excuse. One may be partially insane and yet be responsible for his criminal acts. The law does not excuse unless the derangement is so great that it actually renders the person incapable at the time of its commission of distinguishing between right and wrong in reference to the particular act charged and proven against him. The law presumes every person who has reached the years of discretion to be of sound mind, and this presumption continues until the contrary is shown. So that when, as in this case, insanity is pleaded as a defense to a criminal charge, the fact of the existence of such insanity at the time of the commission of the act complained of must, before you can acquit on that ground, be established by the evidence to your

State v. Paulsgrove.

reasonable satisfaction, and the burden of proving this fact is upon the defendant.''

No. 6. ''The law presumes every man is sane until the contrary is established by the evidence to the satisfaction of the jury, and when insanity in any form is set up as a defense, it is a fact which may not be proven like any other fact. The burden of proving such insanity is on the defendant, and he is not entitled to the benefit of a mere doubt whether he was or was not insane.''

No. 7. ''The jury are further instructed that excitement, passion and angered feelings or revenge produced by motives of anger, hatred or revenge is not insanity, and that the law holds the wrong doer of an act under such conditions responsible for his acts, and the jury have no right to excuse or in anywise justify or mitigate defendant's act in the taking of Mary Newman's life, except they can do so under and according to law as declared in these instructions.''

No. 8. ''The court instructs the jury that mere weakness of intellect will not shield one who commits a crime, and in this case, although you may believe from the evidence that the defendant is mentally deficient in some degree, yet, unless you are reasonably satisfied by the evidence that at the time the alleged crime is charged to have been committed by the defendant, his mental faculties were so weak and his mind so deficient that he was unconscious at the time of committing the act that it was wrong, and that he ought not to do it, and that he had not the ability or mental capacity to choose between right and wrong, you will find the defendant guilty as charged in the information.''

Among other instructions the court gave the following at the request of the defendant:

No. 1. ''The information in this case is a mere formal charge against the defendant, and of itself is no

evidence whatever of his guilt, and no juror should permit himself to be in any degree or to any extent influenced by it."

No. 2. "The court instructs the jury that, on the question of sanity or insanity of the defendant, you will consider all of the evidence offered in the case, the life, habits, conduct and mental condition of the defendant from his early manhood to the present time, so far as the same are shown in evidence, the homicide itself and all of the circumstances attending it; the absence or presence of any motive for the conduct of defendant, as shown by the evidence, and all the testimony bearing on his sanity or insanity. And if you find that the defendant was at the time of the homicide insane and irresponsible from any disorder or disease of the brain, resulting in such a derangement of the mental faculties that he had not the capacity to distinguish right from wrong as to the act with which he is charged, then the defendant is not responsible in law, and you ought to find him not guilty."

No. 3. "The court instructs the jury that if they believe from the evidence that the defendant was insane or of unsound mind at any time or times prior to the shooting charged in the information, with lucid intervals, or partially lucid intervals or periods in which the defendant knew right from wrong, then and in that case it devolves upon the State to prove by a preponderance of the evidence given in the case that at the time the fatal shot was fired that took the life of the deceased, the defendant was at the time in one of his lucid or partially lucid intervals or periods."

No. 5. "You are further instructed that the law presumes the defendant innocent of the offense charged against him; and the burden of the proof rests on the State to show to the jury from the evidence in the case his guilt beyond a reasonable doubt. If you have a reasonable doubt of defendant's guilt, you should ac-

quit him; but a doubt to authorize an acquittal on that ground ought to be a substantial doubt touching defendant's guilt, and not a mere possibility of his innocence.''

No. 6. ''The jury are instructed that when the evidence fails to show any motive on the part of the defendant to commit a crime charged, this is a circumstance in favor of his innocence, and in this case, if the jury find, upon a careful examination of all the evidence, that it fails to show any motive on the part of the defendant, Paulsgrove, to commit the crime charged against him, then this is a circumstance which the jury ought to consider, in connection with all the evidence in the case, in making up their verdict. In order to ascertain whether or not a motive existed on the part of said defendant to commit the crime charged against him, they will take into consideration all the evidence in the case.''

No. 8. ''If, after fully and deliberately weighing and considering all the evidence before them in this case, the jury entertain any reasonable doubt of the defendant's guilt, they must give him the benefit of such doubt and acquit him. A juror is understood to entertain a reasonable doubt when he has an abiding conviction of mind founded on the evidence to a moral certainty that the defendant is not guilty as charged.''

No. 9. ''By the terms 'preponderance of the testimony,' and 'burden of proof,' as used in the instructions in this case, is meant the greater weight of the testimony in the case.''

No. 10. ''The jury are instructed that the plea of insanity or imbecility of mind is a lawful one in this case, and to establish the insanity or imbecility of the defendant, positive and direct proof of it is not required by law, and to entitle him to an acquittal by reason of his mental insanity or imbecility of any

character, circumstantial evidence, which reasonably satisfies your minds of its existence, is sufficient.''

The defendant prayed other instructions which were refused and they will be noted in the course of the opinion.

I.   It is insisted by the Attorney-General that the court should only examine the record proper on this appeal on account of the manner in which the transcript has been certified to us.   There is much force in the contention.   It is greatly to be regretted that counsel in these criminal causes, especially where a charge is so grave as in this case, do not superintend the making up of the transcript.   After a consideration, however, of all the matter certified by the clerk, and inartistically as the record is made up, in view of the gravity of the charge, we have felt it our duty to consider the whole record, matters of exception as well as the record proper.

II.   The issue was simple and single and the controlling question submitted to the jury was whether the defendant was sane or insane when he shot and killed Miss Newman.   The evidence left not a shadow of a doubt that the defendant shot and killed Miss Newman, and upon the conclusion of the evidence and the instructions of the court, there was no middle ground left for the jury to occupy under the evidence and the law.   They were bound either to find the defendant guilty of murder in the first degree, or acquit him on the ground that by reason of his insanity he was not responsible for his act in killing the deceased. And this was the view taken by the learned circuit court as indicated by his instructions to the jury.   The reading of the instructions on the subject of insanity will show that they are in harmony with the law of this State on that subject since the case of Baldwin v. State, 12 Mo. 223.   There is, it is true, the omission of one

word in the fifth instruction given for the State, wherein the court says, "Partial insanity does not excuse." The word "always" by an oversight is left out, but when the whole instruction on that subject is read together, it seems to us impossible that the jury should have been mislead by this inadvertent omission of the word "always." The court properly declared the law to be that one may be partially insane and yet responsible for his criminal acts. The law does not excuse unless the derangement is so great that it actually renders the person incapable at the time of its commission of distinguishing between the right and the wrong in reference to the particular act charged and proven against him. And this was the view announced in the instructions asked by the defendant and given by the court. In the sixth instruction given for the State the word "not" was incorrectly and inadvertently (evidently) incorporated in the instruction, but the use of the word "not" in this instruction is so plainly an inadvertence that when we consider all the instructions together, we cannot believe that it had any prejudicial effect upon the rights of the defendant. Taking the instructions given on both sides of the question together, we think the issue as to the sanity or insanity of the defendant and his criminal responsibility for the killing of Miss Newman, was fairly and fully submitted to the jury. And the evidence called for the instructions as given. It was a question of fact which the jury alone were authorized to pass upon under the instructions of the court, and while there was evidence tending to support the claim of the defendant that he was not responsible for his act, it was too obvious for discussion that there was ample evidence from which the jury could find that the defendant was sane at the time he shot and killed the deceased and knew the right from the wrong of his act in so doing. There is nothing in the finding of the jury on this point that smacks of bias or

prejudice, or that would justify this court in assuming the prerogative of the jury in weighing the evidence and reaching a different conclusion. We have too often decided that we will not invade the province of the jury and attempt to pass upon the weight of the evidence.

III. We have carefully considered the various objections made during the progress of the trial to the admission and exclusion of evidence. The defense was insanity and the court was exceedingly liberal in allowing the defendant great latitude in his efforts to establish his insanity. Without recapitulating each item of evidence to which objection was made, it must suffice to say that we have been unable to find any ruling on the admission or exclusion of evidence that could be said to be prejudicial to the defendant.

IV. This brings us to a consideration of the instructions asked by the defendant and refused by the court. The first of these instructions sought to have the court direct the jury that if the defendant in an excited and passionate frame of mind without adequate cause or provocation, killed the deceased, then they would find him guilty of murder in the second degree. There was no error in refusing this instruction, because there was not a particle of evidence which would have justified the jury in finding the defendant guilty of murder in the second degree. There was no just provocation which would have reduced the homicide to murder in the second degree. And all the evidence tended to show that if the defendant was sane, he was guilty of murder in the first degree, or nothing. [State v. Speyer, 182 Mo. 77; State v. Holloway, 156 Mo. 222; Baldwin v. State, 12 Mo. 223.]

No error occurred in the refusal of the second of these refused instructions, because the court had already fully instructed on that question in the instruc-

tion numbered three given at the instance of the defendant. Likewise the court properly refused the third of these refused instructions, because it had fully covered the proposition involved by its instruction numbered three given in behalf of the State and instruction numbered five given for the defendant.

The fourth of these instructions which the court refused sought to have the court instruct on manslaughter in the fourth degree, if the defendant killed the deceased because she refused to marry him. There was no evidence in the case which would have authorized the court to instruct on manslaughter in any degree. There was not a scintilla of evidence tending to show the slightest lawful provocation for the homicide.

The fifth and sixth of these refused instructions had already been fully covered by the instructions for the State and the defendant, and it was not error to refuse to repeat them.

The last of these refused instructions sought to submit to the jury the law as to a conviction upon circumstantial evidence. As was said in State v. Soper, 148 Mo. l. c. 239, "This instruction would have been misleading. There was no circumstantial evidence about who did the homicide, that was indisputable, while all the evidence as to defendant's mental condition was open, direct and oral. The instruction was properly refused."

V. As already said, the evidence on behalf of the State tended to prove a deliberate, premeditated case of murder in the first degree. To avoid the consequence of this proof, the defendant interposed the defense of insanity, and while there was evidence tending to establish that defense, there was a great mass of evidence on the part of the State given by the neighbors and employers of the defendant, which tended to prove that the defendant was not insane when he shot

and killed the deceased. And this question was one which was resolved by the jury against the defendant, and the jury were amply justified in reaching that conclusion.

After a careful consideration of the whole record, we have been unable to find any reversible error and it results that the judgment of the circuit court must be and is affirmed and the sentence which the law pronounces is directed to be carried into execution.

*Fox, P. J.,* and *Burgess, J.,* concur.