**STURM**

v.

**WASHINGTON NAT. INS. CO.**

**No. 14812.**

United States Court of Appeals
Eighth Circuit.

Nov. 13, 1953.

Rehearing Denied Dec. 5, 1953.

Writ of Certiorari Denied
March 8, 1954.

See 74 S.Ct. 516.

Edward C. Friedewald, St. Louis, Mo., for appellant.

Lon Hocker, St. Louis, Mo., (Jones, Hocker, Gladney & Grand and James C.

Jones, Jr., St. Louis, Mo., were with him on the brief), for appellee.

Before GARDNER, Chief Judge, and WOODROUGH and THOMAS, Circuit Judges.

GARDNER, Chief Judge.

This is an action to recover $4,000 under the double indemnity benefit provision of a life insurance policy issued by the appellee on the life of Ernst Sturm, Sr., of St. Louis, Missouri. The insured made application for the policy to the appellee in Chicago through its agent in St. Louis. So far as material here the application was received and accepted in Chicago and the policy was issued and sent to the appellee's agent in St. Louis, where it was delivered to the insured.

The policy was in force when the insured committed suicide on December 18, 1942. The insured's widow and beneficiary, Anne Sturm, furnished proof of death and received the payment of $4,000 on January 6, 1943. Thereafter the widow died and her son Ernst Sturm, Jr., as administrator of her estate, demanded of appellee the double indemnity benefit. Payment was refused and this action to recover it in the amount of $4,000 was begun.

In its answer the appellee denied liability, alleging that in her proofs of death furnished in December, 1942, Anne Sturm, the beneficiary, stated that the death of the insured was the result of "self-inflicted suicide", and that the double indemnity benefit of the policy was payable only upon receipt by the appellee upon due proof that the insured's death resulted directly, independently and exclusively of all other causes from bodily injury effected solely through external, violent and accidental means, and that no proof has ever been made or furnished to the defendant that the death of Ernst Sturm was within the coverage of the double indemnity provision of the policy, and that the policy provided that:

"The double indemnity benefit shall not apply or be payable if the death of the assured resulted * * * (b) from self-destruction, whether sane or insane."

It was further alleged that the policy is an Illinois contract and is subject to and is controlled by the laws of the State of Illinois.

At a pre-trial conference it was admitted "that if the contract of insurance was an Illinois contract the plaintiff can not recover; that if the contract of insurance was a Missouri contract the plaintiff is entitled to recover if Ernst Sturm, Sr., was insane at the time he committed suicide."

It was further admitted that the appellee insurance company was located in Chicago, Illinois, and was duly licensed by the Department of Insurance of the State of Missouri to do business in Missouri continuously from 1904 to 1933, inclusive, and that the insured Ernst Sturm, Sr., was a citizen and resident of Missouri in 1931 and thereafter.

The case was submitted to the court at a trial without a jury. Only two issues were submitted for decision. They were (1) whether the policy in suit was an Illinois or a Missouri contract; and (2) whether the insured was sane or insane at the time he committed suicide. At the conclusion of the trial the court found and held (1) that the contract was a Missouri contract and (2) that the burden of proof that the insured was insane when he committed suicide was on the plaintiff and he had not sustained that burden. Judgment was accordingly entered for the defendant insurance company and the plaintiff appeals.

Appellant contends that the court erred in finding and holding that appellant did not sustain the burden of proof that the insured was insane at the time of his death. The appellee has not appealed although it contends here that the court erred in holding that the insurance policy in question was a Missouri contract. The court did not err in holding that the contract was a Missouri contract. See New York Life Insurance Co. v. Chapman, 8 Cir., 132 F.2d 688, certiorari denied, 319 U.S. 749, 63 S.Ct. 1158, 87 L.Ed. 1704. The Missouri statute, section 6150, R.S. 1919, V.A.M.S. § 376.620, provides that (1) suicide shall

not be a defense to an action on the policy, unless suicide was contemplated when the policy was applied for and taken out; and (2) "any stipulation in the policy to the contrary shall be void." See Aufrichtig v. Columbian Nat. Life Ins. Co., 298 Mo. 1, 249 S.W. 912.

As to the issue of insanity, the only issue submitted to the court on evidence, Dr. Eugene H. Edele testified that the insured, Ernst Sturm, Sr., came to him "because he was paralyzed on the side of the body. * * * I examined him —he had arterio-sclerosis, a hypertension, and a cerebral vascular accident or stroke; hardening of the arteries is a progressive disease of the blood vessels; it affects the brain as well as any other blood vessels; it results in a decrease in the blood supply of the brain; he was very depressed about his condition—on several occasions while reciting his complaints he broke down and cried; his speech was slurred; the paralysis affected his face and entire body, including his tongue."

On cross-examination he said: "I don't know when he sustained the cerebral accident. It affected his arms and legs on the one side; that condition continued up to the time of his death."

On redirect examination he testified that the arterio-sclerosis was in an advanced stage so that the entire brain probably would be affected and the mental reaction could be the result of the arterio-sclerosis.

Members of the insured's family and neighbors also testified as to the condition of his health and conduct as follows:

Ernst Sturm, Jr., testified that his father worked steadily until 1939 when he had the first stroke. His father could read both German and English and was a trained brewer and that he played chess as a hobby. For a time after this stroke his father got better, and then it seemed like he had another stroke, and in about July, 1942, several things happened that indicated that he was not as alert; his thoughts became dispersed, increasing lack of memory brought up instances almost daily that showed he was not the same. He stopped reading the daily newspaper and stopped writing; he went down to collect his sick benefits until about two months before his death but after that his wife always went with him.

Joseph Sturm, son of deceased, testified that he went into the Navy in March, 1942, and came home on a furlough in July and his father did not recognize him when he came home.

Anna Puchner, a family friend, testified that she saw the insured over a period of years; that on his last visit he could not place the chess pieces in their places on the chess board, and that he never played after that.

Frank Puchner testified that for many years he played chess regularly with the insured but that about two months before insured's death he could not place the figures in their places on the board and that he stopped playing, and also stopped visiting him.

Margaret Lavsky, sister-in-law of insured, testified that she saw the insured almost daily the last few years of his life; that a week before his death she sent him to the store for a can of baking powder and he brought back twenty-five cans; that about a week before his death he went out to shovel snow and she found him shoveling snow from the street to the sidewalk.

The substance of their testimony was summarized in a hypothetical question propounded to Dr. Leopold Hofstatter, a witness for plaintiff. The doctor is a graduate of the University of Vienna, Austria, with post-graduate training there and at Barnes Hospital, Washington University in St. Louis. He is connected with the research staff of the University in the department of psychiatry. He is experienced in the treatment of mental diseases in connection with people who suffer from arterio-sclerosis. In answer to the question which hypothesized the testimony of the witnesses, the doctor testified that on the basis of the symptoms described the insured was insane; that translating the symp-

toms into medical neuropsychiatric terminology would amount to memory defects or memory impairment, impairment of reasoning and judgment, affective incontinence, which means the individual was unable to control himself; that the whole symptomatology fits the text book picture of a senile psychosis or senile dementia type of insanity; that insured did not have mind or mentality enough to understand or appreciate the wrongfulness of the suicidal act that he committed; he did not have reasoning power and judgment to decide it was right or wrong; that he was deprived of this capacity by extensive, probably diffused, brain damage from long standing arterio-sclerosis and hypertension; that a diagnosis of insanity is not made on one single fact but from all the symptoms together.

No evidence was introduced by the defendant-appellee.

The court found that "The plaintiff has not sustained the burden of proof that the insured, when he committed suicide, was insane and did not have mind or mentality enough to appreciate or understand the wrongfulness or moral consequences of his act"; and judgment was entered for the defendant.

Plaintiff in seeking reversal in substance contends that (1) the court erred in finding that the plaintiff failed to sustain the burden of proof by a preponderance of the evidence that insured was unable to understand or appreciate the wrongfulness or moral consequences of his suicidal act; (2) the court erred in not applying the laws of the State of Missouri to the facts presented to the trial court by plaintiff; (3) that under the Missouri law as applied by its courts, the testimony of qualified expert witnesses is conclusive and binding upon the court when the subject is one for expert or skilled witnesses alone and the court can not properly be assumed to have, or be able to form, correct opinion of their own on the subject; (4) that the effect of arterio-sclerosis and hypertension and the correlation of the symptoms relating to the effect of that disease upon the mental actions of an individual are proper subjects for qualified experts; (5) that the test of insanity is whether the individual was so far mentally unsound that he could not exercise a rational judgment upon the question of life and death.

■■■ It is the settled law of Missouri that suicide is not a defense to an action on a life insurance policy unless suicide was contemplated when the policy was applied for and taken out. Missouri R.S.1919, Sec. 6150. It is also the settled law of Missouri that suicide by an insured while insane constitutes accidental death. Brunswick v. Standard Accident Ins. Co., 278 Mo. 154, 213 S.W. 45, 7 A.L.R. 1213. As this is a diversity of citizenship case the substantive law of Missouri must be applied. The appellate courts of that state have repeatedly held that insanity is a physical disease located in the brain, or in other words, it is a brain disease. State v. Porter, 213 Mo. 43, 111 S.W. 529; State v. Paulsgrove, 203 Mo. 193, 101 S.W. 27; State v. Holloway, 156 Mo. 222, 56 S.W. 734; State v. Duestrow, 137 Mo. 44, 38 S.W. 554. In State v. Porter, supra [213 Mo. 43, 111 S.W. 531], it is said:

"Insanity is a physical disease, located in the brain, which disease so perverts and deranges one of the mental or moral faculties as to render the person suffering therefrom incapable of distinguishing right from wrong in reference to the particular act charged against him, and incapable of understanding that the particular act in question was a violation of the laws of God and society."

Touching the test as to insanity and the legal approach to the subject, the Supreme Court of Missouri in Lemmon v. Continental Casualty Co., 350 Mo. 1107, 169 S.W.2d 920, 927, quoting from Schouler on Wills (3rd Ed.) p. 103, said:

" 'Insanity, to define that word, settles, as we have already indicated, in the opinion of the best medi-

cal men, into a comparison of the individual with himself and not with others; that is to say, some marked departure from his natural and normal state of feeling and thought, his habits and tastes, which is either inexplicable or best explained by reference to some shock, moral or physical, or to a process of slow decay, which shows that his mind is becoming diseased and disordered.' "

With these pronouncements by the Missouri appellate courts in mind, we turn to a consideration of the evidence in this case. The insured was presumed to be sane. In civil cases, however, a presumption is not evidence and is not to be weighed in the scale as against evidence. But when substantial evidence is introduced tending to prove a fact, the presumption disappears. Reliance Life Ins. Co. v. Burgess, 8 Cir., 112 F.2d 234; Rupp v. Guardian Life Ins. Co., Mo.App., 170 S.W.2d 123; Griffith v. Continental Casualty Co., 299 Mo. 426, 253 S.W. 1043; McKiver v. Theo. Hamm Brewing Co., 67 S.D. 613, 297 N.W. 445. In Reliance Life Ins. Co. v. Burgess, supra [112 F.2d 238] referring to the effect of a presumption, it is said:

"There was substantial evidence before the jury warranting a finding of suicide. This being true, the presumption fell out of the case. Such a presumption can never be given weight as evidence."

The attending doctor testified from personal knowledge obtained as the insured's physician, that he had suffered three paralytic strokes; that he was suffering from arterio-sclerosis and that arterio-sclerosis extended to the brain, so that we have here a diseased brain and the arterio-sclerosis seems to have reached an advanced stage. This testimony in itself was substantial evidence and goes far to establish insanity as defined by the Supreme Court of Missouri. State v. Porter, supra.

The other testimony is that of relatives and close friends. The insured was unable to recognize his own son although he had been absent only three or four months. He was an expert chess player, yet shortly before his death he was unable to place chess figures on the chess board. He had frequently done chores for his sister-in-law who sent him to the grocery store to get a can of baking powder and he returned with twenty-five cans of baking powder. He undertook to shovel snow off the sidewalk but instead shoveled snow onto the sidewalk. He suffered from hypertension and at frequent intervals, without apparent reason, lost control of himself and broke down and cried.

If there were no other testimony than that of the attending physician and lay witnesses it would clearly indicate a radical change in the appearance and action of this person, and as compared with his conduct, physical condition and appearance prior to the paralytic strokes and the advanced stage of his arterio-sclerosis, he was certainly far from normal. As has been observed, Dr. Hofstatter, confessedly a well qualified and experienced psychiatrist, was asked a hypothetical question fairly embodying all of the testimony with reference to the physical condition of the insured at and immediately prior to the time he committed suicide and his conduct during a like period. This included the testimony of the attending physician as to the arterio-sclerosis of the brain and his paralytic strokes. The doctor stated very clearly his opinion that at the time he committed suicide he was of unsound mind to such an extent that he did not and could not appreciate the wrongfulness of the suicidal act which he committed. There was no evidence produced by the defendant.

It is observed that the court based its decision on the theory that the plaintiff had not sustained the burden of proof. This was in the nature of a legal conclusion rather than a finding of fact. The court did not find that the insured was sane when he committed suicide, thus giving effect to the presumption of sanity. It can not be gainsaid that if this case had been tried in the state court

from which it was removed, the testimony of the expert witness would have been accepted as conclusive on the question of insured's sanity and the plaintiff would have had judgment. Thus in Kane v. St. Louis Refrigerator Transit Company, Mo.App., 83 S.W.2d 593, 596, it is said:

"The question as to whether or not Kane was suffering with bilateral lobar pneumonia at the time he met with his accident is not within the knowledge of laymen, and the commission had no power to disregard the uncontradicted evidence of the three qualified expert witnesses."

■ It is argued by defendant, however, that the court was not required to accept or credit the testimony of the expert witnesses, and in support of that contention counsel cite United States v. Washington Dehydrated Food Co., 8 Cir., 89 F.2d 606. In that case we said that expert testimony is not controlling if unreasonable and improbable or is such that reasonable men might draw different conclusions therefrom. In the instant case the expert testimony does not stand alone, as we have already observed. The insured was suffering from a brain disease and it can not be said that the testimony of the expert is unreasonable nor improbable. It is sustained and corroborated by the proven facts. But there is, we think, a conclusive answer to this contention. The court did not decide the case on the ground that this testimony was incompetent or that it was not credible, but merely on the ground that the plaintiff had not sustained the burden. In other words, the court was of the view that the evidence was not sufficient to sustain the burden of proof which is often referred to as being the preponderance of the evidence. There can be no doubt in the instant case but that the evidence for the plaintiff was in the preponderance as no evidence whatever was introduced on behalf of the defendant, and there was nothing with which to compare its weight, unless it was the presumption of sanity.

Apparently the court in weighing the evidence considered the presumption of sanity as evidence, and this, as we have observed, is not permissible. The test of insanity must be determined by the laws of Missouri and the decisions of the appellate courts of Missouri stress the fact that insanity is a brain disease and the evidence in the instant case, quite aside from the expert testimony, is conclusive that the insured was suffering from a brain disease. Here the testimony is indisputed, unimpeached and entirely reasonable. A consideration of the entire record leaves us with the abiding conviction that the insured at the time he committed suicide was insane, and hence, we have a "definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 68 S. Ct. 525, 542, 92 L.Ed. 746.

The judgment appealed from is therefore reversed and remanded with directions to enter judgment for the plaintiff.